**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SAMANTHA WHITEHEAD, individually and on behalf of all others similarly situated<br><br>Plaintiff,<br><br>v.<br><br>INOTEK PHARMACEUTICALS CORPORATION, DAVID P. SOUTHWELL, RUDOLF A. BAUMGARTNER, DALE RITTER, and WILLIAM MCVICAR,<br><br>Defendants. | Case No.<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Samantha Whitehead ("Plaintiff"), by her attorneys, except for her own acts, which are alleged on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Inotek Pharmaceuticals Corporation ("Inotek" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all persons who purchased Inotek common stock between July 23, 2015 and December 30, 2016, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's claims are asserted against certain of Inotek's executive officers and directors.

2.     Inotek is a clinical-stage biopharmaceutical company advancing molecules with novel mechanisms of action to address significant diseases of the eye.  The Company completed its initial public offering in February of 2015 of  6,667,000 shares of common stock at a price of $6.00 per share.  Inotek's business strategy is to develop and progress its product candidates through human clinical trials and commercialize such products if successfully developed.

3.     Trabodenoson is Inotek's lead drug candidate for glaucoma and is the only product Inotek is currently developing in its pipeline.  MATrX-1 was a Phase 3 randomized, double-masked, placebo-controlled trial of trabodenoson in 303 subjects diagnosed with glaucoma.  It was designed to assess the efficacy, safety and tolerability of trabodenoson over three months of treatment.

4.      As stated in the Company's Form 10-K filed with the SEC on March 23, 2016 (the "10-K"), Inotek "***depend[s] substantially on the success of our product candidates, particularly trabodenoson monotherapy and trabodenoson FDC, which are still in development. If we are unable to successfully develop and commercialize our product candidates, or experience significant delays in doing so, our business will be materially harmed.***" (emphasis in original).

5.      After announcing a positive End of Phase 2 meeting with the United States Food and Drug Administration ("FDA") and announcing that Inotek was in the "final preparation stages to commence its first Phase 3 trial in 4Q and look forward to data in 2016," the Company's stock soared from $5.22 per share on July 22, 2015 to $15.37 on July 23, 2015.

6.      Since July 23, 2015, in an effort to maintain Inotek's surging stock price, Inotek and certain of its officers and directors have misrepresented the efficacy of trabodenoson and its attendant capacity to receive New Drug Approval by the FDA. For example, these materially false and misleading statements included, among others that:

- "[W]e believe trabodenoson has the potential to significantly change how glaucoma is managed, potentially supporting earlier intervention in a substantially larger population of patients."

- "[Trabodenoson] has potential as a valuable treatment option for physicians managing the IOP of patients with this disease."

- The FDA's acceptance of the trabodenoson Phase 3 development "marked a critical milestone for the Company."

- "*Trabodenoson* has the potential to be a convenient, safe and innovative treatment option for patients suffering from glaucoma based on its targeted approach of restoring the natural pressure-regulating process in the eye to lower IOP."

3

7.     On January 3, 2016, prior to the market open, Inotek issued a press release announcing the first pivotal Phase 3 trial of trabodenoson failed to achieve its primary endpoint of superiority in the reduction of intraocular pressure compared with placebo at all 12 time points.

8.     On this news, the price of Inotek common stock dropped from a closing share price of $6.10 on December 30, 2016 to a closing share price of $1.75 on January 3, 2017, *a loss of approximately 70%,* on extremely heavy trading volume.

## JURISDICTION AND VENUE

9.     The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. §78aa.

11.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District.  Inotek is headquartered in this District, with its principal place of business located at 91 Hartwell Ave, Lexington, MA 02421.

## PARTIES

13.     Plaintiff Samantha Whitehead purchased Inotek securities as set forth herein and in her certification filed herewith.

4

14.     Inotek is a corporation headquartered in Lexington, Massachusetts and organized and existing under the laws of the State of Delaware.  Its common stock trades on the NasdaqGM ("NASDAQ") under the symbol "ITEK."

15.     Defendant David P. Southwell ("Southwell") is the President, Chief Executive Officer ("CEO"), and a member of the board of directors of Inotek.

16.     Defendant Rudolf A. Baumgartner ("Baumgartner") is the Executive Vice President and Chief Medical Officer of Inotek.

17.     Defendant Dale Ritter ("Ritter") is the Vice President and Chief Accounting Officer of Inotek.

18.     Defendant William McVicar ("McVicar") is the Executive Vice President and Chief Scientific Officer of Inotek.

19.     Defendants Southwell, Rudolf and Ritter are collectively referred to herein as the "Individual Defendants."

20.     Inotek and the Individual Defendants are collectively referred to as the "Defendants."

## CONTROL PERSON ALLEGATIONS

21.     By reason of the Individual Defendants' positions with the Company as executive officers, (and in Southwell's case, as a director as well) the Individual Defendants possessed the power and authority to control the contents of Inotek's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had

not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

22.     Inotek is a clinical-stage biopharmaceutical company advancing molecules with novel mechanisms of action to address significant diseases of the eye.  The Company's business strategy is to develop and progress its product candidates through human clinical trials and commercialize such products if successfully developed.  Inotek completed its initial public offering in February of 2015 of 6,667,000 shares of common stock at a price of $6.00 per share.

23.     MATrX-1 was a Phase 3 randomized, double-masked, placebo-controlled trial of trabodenoson in 303 subjects diagnosed with primary open-angle glaucoma ("POAG") or ocular hypertension ("OHT").   It was designed to assess the efficacy, safety and tolerability of trabodenoson over three months of treatment.

24.     Trabodenoson is Inotek's lead drug candidate for glaucomoa and is the only product Inotek is currently developing in its pipeline.  Aside from MATRrX-1, the only other ongoing clinical development is a phase 2 trial also using trabodenoson, but in combination with latanoprost as a treatment for glaucoma.

### The Material Misrepresentations and Omissions

25.     On July 23, 2015, the beginning of the Class Period, Inotek issued a press release announcing a positive End of Phase 2 meeting with the FDA and announcing that Inotek was in the "final preparation stages to commence its first Phase 3 trial in 4Q and look forward to data in 2016."  The company touted the optimistic outlook of the Phase 3 trabodenoson trial:

> "There is a major unmet medical need for a well-tolerated and effective therapy with a new mechanism of action for glaucoma," said Rudolf Baumgartner, M.D, Chief Medical Officer of Inotek. "Our overall program will consist of three clinical trials encompassing a total subject exposure of 1300 patients. Our previous Phase 2 studies have demonstrated that trabodenoson's efficacy improves over time, and with increases in dose. *A benefit of the Phase 3 superiority design is that we can investigate more than one dose of trabodenoson, allowing us to further optimize the drug's clinical and safety profile*."

(emphasis added). In light of this announcement, Inotek's price per share increased from $5.22 per share on July 22, 2015 to $15.37 on July 23, 2015.

26. Defendant William McVicar, Inotek's Chief Scientific Officer, further commented that "If we are able to demonstrate the same neuroprotective effects of trabodenoson in humans, *we believe trabodenoson has the potential to significantly change how glaucoma is managed, potentially supporting earlier intervention in a substantially larger population of patients*." (emphasis added).

27. On October 16, 2015, Inotek announced that the dosing of patients in MATRx-1 had commenced. Defendant Rudolf Baumgartner, Inotek's Chief Medical Officer stated:

> Based on the encouraging Phase 2 results as well as guidance from the U. S. Food and Drug Administration (FDA), our team has formalized plans for our Phase 3 program to support a New Drug Application (NDA) for trabodenoson in glaucoma. If approved, trabodenoson—with its potential for once daily dosing and a mechanism that may compliment currently available glaucoma medications—*has potential as a valuable treatment option for physicians managing the IOP of patients with this disease*."

28. Defendant William McVicar, Executive Vice President and Chief Scientific Officer, explained how trabodenoson would operate to successfully treat glaucoma:

> Trabodenoson was developed with the objective of restoring the natural pressure-regulating process that occurs in the healthy eye, and thus lowering IOP. The compound specifically targets the adenosine A1 receptor, one of four known receptors for this

naturally occurring purinergic regulator. Stimulation of the A1 receptor on human trabecular meshwork cells in culture releases proteases, which can digest and remove hydrolyzed proteins that can clog the trabecular meshwork, obstructing the eye's drainage system.

29.     On November 12, 2015, Inotek issued a press release announcing Third Quarter 2015 financial results and operational highlights.  Defendant David P. Southwell, President and CEO of Inotek, stated that the FDA's acceptance of the trabodenoson Phase 3 development "marked a critical milestone for the Company" and that Inotek was "excited to have initiated patient dosing for MATrX-1, the first pivotal Phase 3 trial of *trabodenoson* in patients with glaucoma."

30.     On March 23, 2016, Inotek reported fiscal year 2015 financial results and operational highlights, focusing on trabodenoson's success and expected top-line results:

> "2015 was a transformational year for Inotek as *we achieved several significant regulatory, clinical and financial accomplishments, including the advancement of trabodenoson, a potential novel treatment for glaucoma without the side-effects of other topical treatments, into Phase 3 registration studies*," said David P. Southwell, President and Chief Executive Officer of Inotek. "Acceptance by the U.S. Food and Drug Administration of the pivotal Phase 3 monotherapy development plan for trabodenoson, evaluating the superiority of trabodenoson's intraocular eye-pressure ("IOP") reduction compared to placebo, marked an important inflection point for the Company. Additionally, we have continued to build a strong management team and board of directors, and strengthened our balance sheet by completing both an IPO with concurrent convertible note offering and follow-on offering, with net proceeds totaling approximately $129 million."
>
> "2016 is off to a strong start. *We are pleased to report that our first Phase 3 monotherapy trial ("MATrX-1") continues to enroll on schedule, with top-line results expected in 4Q'16*. In addition, we plan to initiate our second Phase 2 fixed-dose combination study, evaluating trabodenoson and latanoprost in a single eye drop, this year."

(emphasis added).

31.     On March 23, 2016, Inotek filed the 10-K, which stated Inotek's intention to file a

New Drug Application ("NDA") upon successful completion of the Phase 3 trabodenoson trial:

> We started our Phase 3 program for *trabodenoson* monotherapy in
> October 2015, and, based on our estimate of the rate of patient
> enrollment, we expect to report top-line data from the first pivotal
> trial in the program by late 2016. ***If the primary objectives of all of
> the trials in our Phase 3 program are met, we plan to submit a New
> Drug Application, or NDA, to the FDA for marketing approval of
> trabodenoson for the treatment of glaucoma*** in the United States.
> We plan to submit a marketing authorization application, or MAA,
> in Europe after filing our NDA for approval of *trabodenoson* in the
> United States.

(emphasis added).

32.     The 10-K assured investors that trabodenoson was bound for success, stating "[o]ur

clinical trials have shown that *trabodenoson* has significant IOP-lowering effects, convenient

dosing and also has a favorable safety profile when compared to the currently available glaucoma

treatments, such as PGAs and non-PGAs."  The 10-K provides further assurances, stating:

> The neuroprotective potential of *trabodenoson* is supported by the
> basic biology of adenosine, which has shown that the stimulation of
> the A1 receptor can protect tissues of the central nervous system. A
> pre-clinical study of the impact of high IOP on RGCs showed that
> *trabodenoson* could protect this key population of cells in the retina
> that, when lost, result in the irreversible vision loss associated with
> glaucoma.

33.     In an August 10, 2016 press release, the Defendant Southwell commented that he

was looking forward to sharing the results of the MATrX-1 trial, stating:

> With our objective achieved in the first half of the year, we look
> forward to keeping our shareholders updated on the progress of
> MATrX-1, our initial Phase 3 monotherapy trial of *trabodenoson*.
> We expect to report completion of enrollment in this trial in the third
> quarter of this year and top-line data in the fourth quarter of this
> year.

34.     On August 24, 2016, Inotek issued a press release announcing the completion of the active recruitment of phase of MATrX-1 and MATrX-1's anticipated results:

> "As anticipated, MATrX-1 has recruited on time, consistent with our fourth-quarter guidance for top-line data," said Rudolf Baumgartner, MD, Executive Vice President and Chief Medical Officer. "*Trabodenoson* has the potential to be a convenient, safe and innovative treatment option for patients suffering from glaucoma based on its targeted approach of restoring the natural pressure-regulating process in the eye to lower IOP, and we are looking forward to the results of this trial."

35.     At all relevant times, these statements were false and misleading because Inotek management was well aware that the pivotal portion of the MATrX-1 phase 3 clinical trial of trabodenoson would fail to achieve its primary endpoint of statistical relevance in the reduction of intraocular pressure compared with placebo. Specifically, because of the FDA's acceptance of the Phase 3 development program, Inotek management was in constant communication with the FDA regarding the status of the ongoing MATrX-1 phase 3 clinical trial and had actual knowledge that trabodenoson was underperforming when compared to the placebo. Despite this, Inotek management continued to mislead investors regarding the status of the MATrX-1 phase 3 clinical trial, the efficacy and safety of trabodenoson, and trabodenoson's attendant likelihood for approval as a NDA by the FDA.

**The Truth Emerges**

36.     On January 3, 2017, before the market opened, Inotek issued a press release announcing the first pivotal Phase 3 trial of trabodenoson for the treatment of primary open-angle glaucoma or ocular hypertension failed to achieve its primary endpoint of superiority in the reduction of intraocular pressure compared with placebo at all 12 time points.  The press release stated, in pertinent part:

10

**Lexington, MA** — **January 3, 2017** — <u>Inotek Pharmaceuticals Corporation</u> (NASDAQ: ITEK), a clinical stage biopharmaceutical company focused on the discovery, development and commercialization of therapies for ocular diseases, today announced top-line results of MATrX-1, the first pivotal Phase 3 trial of *trabodenoson* for the treatment of primary open-angle glaucoma (POAG) or ocular hypertension (OHT). ***The trial did not achieve its primary endpoint of superiority in reduction of intraocular pressure (IOP) compared with placebo at all 12 time points.*** This was, in part, due to a placebo response that was 2-3 mmHg greater than that observed in Phase 2. *Trabodenoson*, the Company's lead clinical candidate, is a first-in-class, highly selective adenosine mimetic targeting the $A_1$ subreceptor *Trabodenoson*, lowers IOP by augmenting the eye's natural function of the trabecular meshwork, the primary outflow pathway for aqueous humor and a site of pathology in glaucoma.

"We are disappointed that the primary endpoint of superiority at all 12 time points was not achieved," commented David P. Southwell, President and Chief Executive Officer of Inotek. "This result was driven primarily by the unexpectedly stronger placebo response at the 8AM time point. However, MATrX-1 did achieve several clinically meaningful secondary endpoints- the 6% dose was significant versus placebo in the daily IOP change from diurnal baseline at all days tested. Additionally, an analysis of responders (subjects with IOP reduction of 5mmHg or greater from baseline) indicated a statistically higher proportion of responders in the 6% *trabodenoson* group than the placebo group at all visits. The safety, tolerability and low discontinuation rate in MATrX-1 continues to suggest that *trabodenoson* is an active molecule with a unique safety profile. Later this quarter, we expect to receive additional data beyond the top-line results reported today. Once we have the additional data, we will determine next steps in the *trabodenoson* monotherapy program."

The primary endpoint of the MATrX-1 trial was the IOP reduction of *trabodenoson* compared to that of placebo on Days 28, 42 and 84 and at four time points during each of these days: 8AM, 10AM, 12PM, and 4PM. ***The 8AM time point did not achieve statistical separation with any trabodenoson dose.*** This was primarily due to an unexpectedly high placebo response compared to that observed in Phase 2, as well as a published meta-analysis by Raber et al.

(emphasis added).

37.    As a result the adverse results of the pivotal portion of the Phase 3 trial of trabodenoson, the price of Inotek common stock declined from a closing share price of $6.10 on December 30, 2016 to a closing price of $1.75 per share on January 3, 2017, *a loss of approximately 70%,* on extremely heavy trading volume.

## ADDITIONAL SCIENTER ALLEGATIONS

38.    As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Inotek, their control over, and/or receipt and/or modification of Inotek's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Inotek, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION

39.    During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Inotek's securities and operated as a fraud or deceit on Class Period purchasers of Inotek securities by materially misleading the investing public. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Inotek's securities fell precipitously, as the prior artificial inflation came out of the price over time. As a

result of their purchases of Inotek securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

40.     At all relevant times, the market for Inotek's securities was an efficient market for the following reasons, among others:

a)     Inotek securities met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b)     Inotek filed periodic public reports with the SEC and the NASDAQ; and

c)     Inotek regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

41.     As a result of the foregoing, the market for Inotek's securities promptly digested current information regarding Inotek from all publicly available sources and reflected such information in the prices of the securities. Under these circumstances, all purchasers of Inotek securities during the Class Period suffered similar injury through their purchase of Inotek securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

42.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and

13

conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Inotek who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Inotek securities during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

44.     The members of the Class are so numerous that joinder of all members is impracticable, since Inotek has millions of shares of stock outstanding and because the Company's shares were actively traded on the NASDAQ.  As of September 30, 2016, Inotek had more than 26.9 million shares issued and outstanding. While the exact number of Class members in unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff

believes that there are thousands of members in the proposed Class and that they are geographically dispersed.

45.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members, including:

(a)     whether the Exchange Act was violated by Defendants;

(b)      whether Defendants omitted and/or misrepresented material facts in their publicly disseminated reports, press releases, and statements during the Class Period;

(c)     whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants participated and pursued the fraudulent scheme or course of business complained of herein;

(e)     whether Defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

(f)     whether the price of Inotek securities was artificially inflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and

(g)     whether the members of the Class have sustained damages as a result of the decline in value of Inotek's stock when the truth was revealed, and if so, what is the appropriate measure of damages?

46.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

47.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

48.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 10(b) of
### the Exchange Act and SEC Rule 10b-5
### (Against All Defendants)

49.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

50.     This Count is asserted by Plaintiff on behalf of themselves and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. C 240.10b-5, promulgated thereunder.

51.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Inotek's common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Inotek's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

52.     Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading;

16

and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and acquirers of the Company's common stock in an effort to maintain artificially high market prices for Inotek's common stock in violation of Section 10(b) of the Exchange Act and Rule 10-5.

53.     As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.  Defendants' material misrepresentations and omissions as set forth herein violated that duty.

54.     Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff and the Class.  Defendants knowingly or recklessly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

55.     As a result of Defendants' fraudulent activity, the market price of Inotek was artificially inflated during the Class Period.

56.     In ignorance of the true financial condition of Inotek, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of Inotek containing the misleading information, purchased or otherwise acquired Inotek's common stock at artificially inflated prices during the Class Period.

57.     Plaintiff and the Class's losses were proximately caused by Defendants' active and primary participation in Inotek's scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company. Plaintiff and other members of the Class purchased Inotek's stock in reliance on the integrity of the market price of that common stock, and Defendants manipulated the price of Inotek's common stock through their misconduct as described herein. Plaintiff's and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of the true financial condition of Inotek.

58.     Throughout the Class Period, Defendants were aware of material non-public information concerning Inotek's fraudulent conduct (including the false and misleading statements described herein). Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information, and Plaintiff's and the Class's losses were the foreseeable consequence of Defendants' concealment of this information.

59.     As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Inotek common stock during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

60.     Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

61.     During the Class Period, the Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees,

attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public. Plaintiff and other members of the Class had no access to such information, which was, and remains solely under the control of the Defendants.

62. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware (or recklessly disregarded) that materially false and misleading statements were being issued by the Company and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws. Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases and other statements prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or to cause them to be corrected.

63. The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Inotek's business, the information contained in its filings with the SEC, and its public statements. Moreover, the Individual Defendants made or directed the making of affirmative statements to securities analysts and the investing public at large, and participated in meetings and discussions concerning such statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed

from the public and that the positive representations that were being made were false and misleading. As a result, the Individual Defendants are responsible for the accuracy of Inotek's corporate releases detailed herein and is therefore responsible and liable for the misrepresentations contained herein.

64.     The Individual Defendants acted as controlling persons of Inotek within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause Inotek to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Inotek and all of its employees. As alleged above, Inotek is a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b-5.  By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

65.     As a direct and proximate result of the wrongful conduct of Inotek and the Individual Defendants, Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

(A)     Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as a representative of the Class and her counsel as Class counsel;

(B)     Awarding Plaintiff and the members of the Class damages, including interest;

(C)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including and attorneys' fees; and

(D)      Awarding such equitable/injunctive or other relief as the Court may deem just and

proper

## **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated:  January 6, 2017                              Respectfully submitted,


                                                     */s/Shannon L. Hopkins*
                                                     **LEVI & KORSINSKY LLP**
                                                     Shannon L. Hopkins (BBO# 657485)
                                                     shopkins@zlk.com
                                                     Stephanie A. Bartone (BBO# 684270)
                                                     sbartone@zlk.com
                                                     733 Summer Street, Suite 304
                                                     Stamford, Connecticut 06901
                                                     Tel.:  (203) 992-4523
                                                     Fax:  (212) 363-7171

                                                     *Counsel for Plaintiff*