**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SAMANTHA WHITEHEAD, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>INOTEK PHARMACEUTICALS CORPORATION, DAVID P. SOUTHWELL, and RUDOLF A. BAUMGARTNER,<br><br>Defendants. | Case No. 1:17-cv-10025-LTS<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Court-appointed Lead Plaintiff Brian Gniadek ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, announcements made by defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Inotek Pharmaceuticals Corporation ("Inotek" or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for these allegations after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all persons who purchased Inotek common stock between July 23, 2015 and July 10, 2017, inclusive (the "Class Period"), seeking

remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's claims are asserted against the Company, as well as certain of Inotek's executive officers and directors.

2. Inotek is a clinical-stage biopharmaceutical company focused on the discovery, development, and commercialization of therapies for ocular diseases. Throughout the Class Period, Inotek's product pipeline included only two potential therapies, both of which employed the Company's most advanced product candidate – trabodenoson – in an effort to reduce inter-ocular pressure ("IOP") in patients with glaucoma.

3. At all relevant times, Inotek was attempting to develop trabodenoson both as a monotherapy and as a fixed-dose combination ("FDC") with latanoprost, a leading glaucoma treatment.[1]

4. Clinical development of trabodenoson initially focused on the trabodenoson monotherapy, beginning with a Phase 1 study designed to assess the safety and tolerability of the drug. In 2009, the Company initiated its first Phase 2 trial of trabodenoson monotherapy, a dose-ranging study that evaluated multiple doses of trabodenoson to determine whether any dose demonstrated a statistically significant improvement in mean IOP when compared to placebo. A second Phase 2 study, initiated in 2014, was purportedly designed to assess the efficacy of trabodenoson when co-administered with latanoprost.

5. Ultimately, after a meeting with the FDA in mid-2015, Inotek was given permission to proceed with a Phase 3 trial of trabodenoson – the MATrX-1 study. The success of MATrX-1 would depend upon the ability of trabodenoson monotherapy to produce a reduction in IOP that was statistically significant as compared to the placebo treatment arm of the study.

[1] Latanoprost is a prostaglandin analogue ("PGA"), which has been approved by the United States Food and Drug Administration ("FDA"). In fact, latanoprost is reportedly the drug most widely prescribed by ophthalmologists for the treatment of glaucoma.

6. From the beginning of the Class Period until the Company released the results of the MATrX-1 Phase 3 trial, defendants issued multiple materially false and misleading statements and omitted to state material facts that rendered their affirmative statements misleading. Specifically, defendants issued multiple public statements repeatedly and unequivocally describing the Phase 2 trials of trabodenoson as "successful" and as a "meaningful accomplishment" and represented that the Phase 3 trial of trabodenoson was "optimized for success." Defendants made these representations despite their knowledge that the results of the Phase 2 trials of trabodenoson were inconclusive at best, insofar as the first Phase 2 study provided no conclusive information regarding dosing efficacy, and the second Phase 2 study did not test trabodenoson as a monotherapy, but rather paired it with another commonly-prescribed glaucoma medication.

7. Moreover, defendants made a number of statements describing trabodenoson as having the potential for "convenient," "once-daily" dosing, despite the fact that the Phase 2 monotherapy study provided ***no*** meaningful data with regard to the use of trabodenoson as a once-daily medication. Because most current glaucoma medications require dosing multiple times per day, a once-daily drug would be particularly attractive to the market, and thus these statements were especially misleading.

8. In July 2016, while the MATrX-1 study was ongoing and defendants continued to tout the likelihood of its success, Inotek began recruiting patients for a Phase 2 FDC trial. In its press release announcing the initiation of the FDC trial, defendants described their FDC product candidate as a therapy with "two complementary eye pressure lowering mechanisms, and an optimized safety and efficacy profile," despite the inconclusive results of the trials the Company had conducted to that point.

9. Ultimately, in January 2017, investors and the market learned that the Phase 3 trial of trabodenoson was unsuccessful, and indeed failed to demonstrate that trabodenoson provided any benefit to glaucoma patients whatsoever (despite Inotek's statements to the contrary following the conclusion of its earlier Phase 2 studies). The misleading press releases and other statements made since the beginning of the Class Period had artificially inflated the price of Inotek stock and, when the Company announced these negative results, Inotek's stock price dropped precipitously, damaging investors who had purchased Inotek stock.

10. Despite the knowledge that trabodenoson did not demonstrate efficacy – even when compared to placebo as opposed to an active drug – defendants continued to promote trabodenoson, misleadingly stating that the fixed-dose combination had the potential for a larger market opportunity than monotherapy and touting the IOP-lowering effects of trabodenoson.

11. Eventually, however, the full truth regarding trabodenoson's lack of efficacy was revealed. On Friday, July 7, 2017, one minute after the market had closed, Inotek announced in a press release that its Phase 2 FDC trial had unequivocally failed, concluding that "the addition of trabodenoson to latanoprost offered no clinically meaningful advantage in eye pressure reduction over latanoprost alone." The press release went on to state that the Company had engaged Perella Weinberg Partners as a financial advisor "to assist with the strategic review process." *See* Ex. A hereto.

12. This announcement caused the Company's to plummet again, dropping $1.73 at the close of trading on July 7, 2017 to only $0.90 as of 12:00 PM on Monday, July 10 – a decline of almost 48%.

13. As of the date of this filing, Inotek had discontinued all preclinical and clinical development of trabodenoson.

## JURISDICTION & VENUE

14. The federal law claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC.

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as well as Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

16. This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

17. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District. Inotek is headquartered in this District, with its principal place of business located at 91 Hartwell Avenue, Lexington, Massachusetts 02421.

18. In connection with the acts, conduct, and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

19. Plaintiff purchased Inotek securities during the Class Period at artificially inflated prices as set forth in the certification on file with the Court.

20. Inotek is a corporation headquartered in Lexington, Massachusetts and organized and existing under the laws of the State of Delaware. Its common stock trades on the NasdaqGM ("NASDAQ") under the symbol "ITEK."

21. Defendant David P. Southwell ("Southwell") is and was at all relevant times the President and Chief Executive Officer ("CEO") of Inotek, as well as a member of the Inotek board of directors.

22. Defendant Rudolf A. Baumgartner ("Baumgartner") is and was at all relevant times the Executive Vice President and Chief Medical Officer of Inotek.

23. Defendants Southwell and Baumgartner are together referred to herein as the "Individual Defendants."

24. Together, Inotek and the Individual Defendants are referred to herein as "Defendants."

25. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

## **SUBSTANTIVE ALLEGATIONS**

**The Company**

26. Inotek describes itself as a clinical-stage biopharmaceutical company advancing molecules with novel mechanisms of action to address significant diseases of the eye. The Company's stated business strategy is to develop and progress its product candidates through human clinical trials and commercialize such products if successfully developed.

27. Throughout the Class Period and presently, Inotek's primary focus was on gaining the approval of the Food and Drug Administration ("FDA") for its lead product candidate, trabodenoson, a proposed treatment for glaucoma.

28. In fact, Inotek's product pipeline includes only trabodenoson monotherapy and a fixed-dose combination ("FDC") of trabodenoson and latanoprost, an FDA-approved product, which is commercially-available and widely prescribed by ophthalmologists for the treatment of glaucoma.

**Understanding Glaucoma**

29. Glaucoma – which afflicts nearly 3 million people in the United Sates – is a disease caused by an increase in pressure within the eye as a result of blockage of the flow of aqueous humor, a watery fluid produced by the ciliary body.[2] Aqueous humor continuously flows through the anterior chamber in the front of the eye—starting at the "ciliary processes" and exiting through two pathways: (1) a spongy tissue known as the trabecular meshwork ("TM") empties the vast majority (70%) of the aqueous humor; and (2) the uveo-scleral pathway empties about 30% of the aqueous humor through the ciliary body.

[2] The ciliary body is a ring of tissue directly behind the outer rim of the iris. In addition to being the source of aqueous humor, it contains the muscle that flattens the curvature of the lens for distance vision.

30. Blockage of the aqueous humor flow, as is seen in glaucoma patients, causes increased intraocular pressure ("IOP") in the posterior chamber of the eye. Ultimately, this increase in IOP will cause damage to the optic nerve, which may lead to partial or total blindness.

31. Not all glaucoma patients have elevated IOP and not everyone with elevated IOP has glaucoma. A normal IOP range is most commonly thought to be between 15 and 21 millimeters of mercury ("mmHg"). It is not uncommon for glaucoma patients to have IOPs upwards of 35mmHg, but 80% have IOPs less than 26 mmHg at the time of diagnosis.

32. In glaucoma patients, pressure builds up in the eye because the outflow of aqueous humor is slower than the inflow. Accordingly, most glaucoma drugs either increase the outflow of aqueous humor or decrease the inflow (or both) in order to restore a more normal pressure within the eye.

33. Most currently-available glaucoma medications must be taken two or three times per day. Patient compliance with treatment for glaucoma is already a problem because of the side effects caused by some medications. Thus, because it is easier and more convenient for patients to take a medication once per day ("QD") rather than multiple times a day, a glaucoma medication that could be dosed QD would be particularly attractive to both consumers and prescribing physicians.

34. One tool used to manage IOP in glaucoma patients is adenosine, a naturally-occurring purine nucleoside that is comprised of an adenine base (one of the 4 components of DNA) and a ribose sugar. It plays a crucial role in energy transfer in cells as part of the adenosine triphosphate ("ATP") molecule as well as in signal transduction pathways. Importantly, with regard to its role in glaucoma, adenosine is also known to play a role in regulating blood flow via induction of vasodilation.

35. The role of adenosine in glaucoma is believed to be twofold: it lowers IOP and it protects retinal ganglion cells. Moreover, it has been shown in several different animal models that adenosine A1 receptor agonists, which bind to the A1 receptor to activate the proper biological response, lower IOP by increasing aqueous outflow. The A1 receptor is believed to activate the ERK1/2 pathway in the trabecular meshwork cells to induce the production of matrix metalloproteinase (MMP)-2, which remodels the extracellular matrix, or simply "unclogs" the trabecular meshwork.

36. Based on the hypothesis that adenosine may regulate pressure in the eye, trabodenoson was designed by Inotek as a glaucoma treatment to mimic the effects of adenosine but be selective for only the A1 receptor.

**The FDA Clinical Trial Process**

37. In the United States, pharmaceutical development and marketing is regulated by the FDA, an agency of the U.S. Department of Health and Human Services. The modern regulatory regime was enacted in 1962, after Thalidomide, a sleeping pill, caused birth defects in thousands of babies. In reaction to this tragedy, Congress passed the Kefauver-Harris Amendments to the Food, Drug and Cosmetic Act (the "FDCA") requiring that: (1) any company that wanted to market a pharmaceutical product in the United States (in industry parlance, a "sponsor") obtain prior approval from the FDA; and (2) the approval be based upon substantial scientific evidence demonstrating that the product was safe and effective for its intended use in humans.

38. The FDCA, as amended, requires the Commissioner of the FDA to refuse any drug application if:

(a) "he has insufficient information to determine whether such drug is safe for use under such conditions;" or

(b) "there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof."

21 U.S.C. § 355(d)(4)-(5).

39. The FDA is only permitted to consider clinical evidence to be "substantial," and thus satisfy the FDCA, if it:

> consist[s] of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof.

21 U.S.C. § 355(d). Well-controlled clinical investigations measure the subject drug against a control group, which in most cases is a placebo or another approved and effective drug used as a comparison. Moreover, well-controlled clinical investigations are almost always conducted in a "doubleblinded" manner, meaning that the tests are designed so that the study participants and the investigators (as well as the sponsor and associated research organizations) do not know whether each participant has been provided the candidate drug or is a member of the control group. Double-blind investigations are intended to minimize bias and error that can arise when the participant and/or investigator have knowledge of the assigned treatment.

40. The sponsor, not the FDA, is responsible for determining the design of clinical trials, via protocols that evaluate the safety and efficacy of the product being tested, as well as designing the protocols themselves. If a sponsor wants the FDA to agree to the design of a protocol, the sponsor may request a Special Protocol Assessment pursuant to 21 U.S.C. § 355(b)(5)(C). Under this provision, the FDA and the sponsor meet to discuss the sponsor's proposed protocols, and the sponsor may request FDA input on how the final protocol will be implemented. *See id*.

41. For each clinical trial, the sponsor also develops a statistical analysis plan ("SAP"). The SAP specifies the statistical techniques that will be used to analyze the data gathered in the study. The SAP is often included in the study protocol; at other times it is a separate document. However, to avoid bias and "data dredging," the SAP for all well-controlled trials is always finalized before the study data is unblinded.

42. The success or failure of a clinical trial is measured by whether the trial meets pre-specified endpoints (target outcomes), and by the statistical significance of its results.

43. In clinical studies, null hypotheses are formulated, which are then rejected or retained with the help of statistical tests. The null hypothesis assumes that any kind of difference or significance seen in a set of data is due to chance. It is presumed to be true until statistical evidence nullifies it for an alternative hypothesis.

44. The null hypothesis is formulated in advance and is tested with the help of a significance test. The p-value is a probability that is the result of such a statistical test. A small p-value signifies that the probability is small that the difference can purely be assigned to chance.

45. A sponsor generally conducts clinical trials in three phases. These phases, which are codified in FDA regulations, are as follows:

(a) Phase I. Phase I dose-tolerance studies "are designed to determine the metabolism and pharmacologic actions of the drug in humans, the side effects associated with increasing doses..."

(b) Phase II. Phase II studies are "typically well controlled" studies "conducted to evaluate the effectiveness of the drug for a particular indication or indications in patients with the disease or condition under study and to determine the common short-term side effects and risks associated with the drug." Phase 2

studies are meant to evaluate safety on a short-term basis, as well as determining dose-tolerance and efficacy.

(c) Phase III. Phase III studies are expanded studies, based upon Phase 2 studies, which are "performed after preliminary evidence suggesting effectiveness of the drug has been obtained, and are intended to gather the additional information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the drug and to provide an adequate basis for physician labeling. Phase 3 studies usually include from several hundred to several thousand subjects." This portion of a clinical trial is meant to provide information about the long-term effectiveness of a drug, based upon the most effective dose of the drug as determined in Phase 2, as well as evaluating the risk-benefit relationship of the drug.

21 C.F.R. § 312.21.

46. According to the FDA's website, a Phase 1 study is intended to establish the drug's safety, based on dose tolerance, as well as the proper dosage for the drug. The FDA's website explains that a Phase 1 study typically involves "20 to 100 healthy volunteers" and lasts "several months." According to the FDA, 70% of drugs pass the Phase 1 study and move to the next phase.

47. The FDA's website explains that a Phase 2 study is designed to determine the drug's efficacy, based on dose tolerance, as well as any possible side effects. According to the FDA, a Phase 2 study typically involves "a few hundred patients" with the disease or condition that the drug is intended to treat and lasts "several months to 2 years." The FDA explains that only 33% of drugs tested in Phase 2 studies are eligible to be tested in Phase 3.

48. According to the FDA's website, a Phase 3 study is designed to further test the

drug's efficacy and to monitor adverse reactions in larger populations. A Phase 3 study uses data collected from the Phase 2 study to "refine research questions, develop research methods, and design new Phase 3 research protocols." According to the FDA, a Phase 3 study typically involves "300 to 3,000 volunteers who have the disease or condition" and lasts "1 to 4 years." The FDA explains that only 25% to 30% of drugs pass the Phase 3 study and are eligible to be reviewed by the FDA.

49. When a sponsor believes it has conducted sufficient well-controlled clinical trials, and believes that those trials demonstrate substantial evidence of efficacy and safety consistent with the FDCA, the sponsor may prepare and submit a New Drug Application ("NDA") to the FDA, seeking approval to market the subject drug in a specific dose for the treatment of a specific condition or "indication."

50. According to the FDA, an NDA "tells the full story of a drug." To be considered, "[a] drug developer must include everything about a drug – from preclinical data to Phase 3 trial data – in an NDA." Further, "[d]evelopers must include reports on all studies, data, and analyses." The NDA must also specify how the drug will be manufactured, packaged and labeled. The FDA can only grant approval when presented with scientific evidence meeting the requisite statutory criteria.

51. An NDA accepted for filing is reviewed only for substance and content to ensure that the sponsor has provided all necessary components or modules before the NDA is distributed to specific reviewers. The FDA's Center for Drug Evaluation & Research ("CDER") may (or may not) convene an advisory committee to provide it with technical advice, enhance its decision-making process, and provide a forum for public discussion of controversial issues.

52. Where an advisory committee is convened, the sponsor and the FDA staff will each

provide the advisory committee briefing documents and make presentations to the advisory committee. After receiving the submissions of both the sponsor and the FDA, and hearing their respective presentations, the advisory committee will discuss the safety and efficacy of the drug candidate and provide the FDA with a nonbinding vote on specific questions regarding safety and efficacy, and whether, in their opinion, approval is warranted based upon the evidence of safety and efficacy provided by the sponsor and the FDA's review of the data.

53. Critically, an advisory committee is the only forum in which the public can legally be advised by the FDA of the FDA's position and the FDA's interactions with the sponsor regarding the drug candidate. Except in advisory committee briefing documents and during the advisory committee hearing, FDA secrecy regulations strictly prohibit the agency from disclosing information regarding pending NDAs. ***As a result, without an advisory committee, the FDA may not publicly refute a sponsor's misrepresentations regarding clinical trials, protocols, or the sponsor's interactions with the FDA.*** *See* 21 C.F.R. §§ 312.130, 314.430.

54. The FDA can only grant approval when presented with scientific evidence meeting the requisite statutory criteria. If the FDA approves the drug candidate, it will issue an approval letter in writing to the sponsor. If the FDA finds that the NDA fails to provide the substantial evidence of efficacy and safety required by statute, or has other material shortcomings which prevent approval, the FDA will send the sponsor a Complete Response Letter ("CRL") identifying the reasons why the application was not approved. A CRL may, but need not always, request that the sponsor conduct additional clinical trials. CRLs are never made public by the FDA when issued, and are never released thereafter as long as the sponsor is continuing to pursue the subject drug application. Accordingly, investors must rely on sponsor companies to provide accurate information regarding CRLs and other interactions of the sponsor with the FDA.

**<u>Inotek's Trabodenoson Trials</u>**

**Phase 1:**

55. Phase 1 of Inotek's trabodenoson trials was a randomized, double-masked, placebo-controlled dose escalation study purportedly designed to assess the safety and tolerability of trabodenoson. The study, which enrolled 70 subjects, took place at a single clinical site in Evansville, Indiana.

56. The purpose of Phase 1 was ***solely*** to determine the safety of trabodenoson – it did not attempt to determine the drug's efficacy as a medication to treat glaucoma.

57. All subjects enrolled in Phase 1 were healthy volunteers aged 35 to 65 years, who were enrolled into one of seven cohorts of 10 subjects each. Each of the cohorts included six subjects receiving the active drug and four subjects receiving placebo. Because the Phase 1 trial was only testing safety, none of the volunteers had glaucoma.

58. Subjects randomized to active treatment received doses of trabodenoson varying from 200 to 3,200 micrograms ("mcg") per dose.

59. Subjects in Cohorts 1-6 received twice-daily ("BID") dosing in one eye for 14 days, with doses beginning at 200 mcg for Cohort 1 and 400, 800, 1,600, 2,400, and 3,200 mcg, respectively, for Cohorts 2-6.

60. Subjects assigned to Cohort 7 received QD dosing in both eyes, beginning at 200 mcg in one eye and 1,600 mcg in the other eye on Day 1, with the dose escalating every other day until Day 15, when the subject received 3,200 mcg in each eye.

61. The safety and tolerability of trabodenoson were assessed on the basis of both laboratory findings and adverse event ("AE") monitoring conducted at selected time points during the treatment period.

62. In Cohorts 1-6, the proportion of subjects with AEs was higher in the placebo group (87.5%, 21/24 subjects) than in the trabodenoson group (50.0%, 18/36 subjects). The proportion of subjects with AEs in Cohort 7 was lower in the placebo group (25.0%, 1/4 subjects) than in the trabodenoson group (50.0%, 3/6 subjects). The proportion of subjects experiencing treatment-related AEs was similar between the placebo and trabodenoson groups.

63. No dose-limiting toxicity was observed in Phase 1. In fact, there was no increase in the frequency of AEs with increasing doses of trabodenoson, and the incidence of treatment-related AEs was similar between the trabodenoson and placebo groups in both parts of the study.

**Phase 2 Monotherapy Trial:**

64. Beginning in 2009, Inotek conducted a Phase 2 monotherapy dose-ranging trial in 144 patients with diagnoses of either ocular hypertension ("OHT") or primary open-angle glaucoma ("POAG"). As depicted in the figure below, subjects were randomized to receive twice-daily ("BID") trabodenoson doses of 50, 100, 200, or 500 mcg for two weeks, and 500 mcg for four weeks. To be eligible, patients had to have an IOP in the range of 24 mmHg and 34 mmHg after being washed off current glaucoma medications.




*Source: Company presentation.*

65. The results for all five dose groups were as follows: only the 200 mcg and 500 mcg doses (at day 14 and day 28) met the primary endpoint by demonstrating statistically significant improvements in mean IOP compared to placebo. There was also a dose-dependent response, with the highest dose, 500 mcg, showing the greatest efficacy – a 6-7 mmHg decrease in IOP.

**Phase 2 Additive Study:**

66. In 2014, the Company initiated an additional Phase 2 trial, co-administrating trabodenoson with latanoprost, a known and commonly-prescribed glaucoma medication that has proven effective in treating glaucoma. The purported purpose of this additive study was to determine whether trabodenoson had an additive effect in patients who were refractory to prostaglandins (already taking latanoprost who were unable to obtain an IOP below the target of 21 mmHg). The study was also a direct comparison of trabodenoson to timolol,[3] which was also

[3] Timolol is a medication used either by mouth or as eye drops. As eye drops, it is used to treat increased pressure inside of the eye, such as in ocular hypertension and glaucoma. By mouth, it is used for high blood pressure, chest pain due to insufficient blood flow to the heart, to prevent further complications after a heart attack, and to prevent migraines. Timolol was patented in 1968 and came into medical use in 1978. Its

co-administered with latanoprost in the control arm of the study.

67. As shown below, in the additive Phase 2 study, 101 patients who were refractory to prostaglandins and had IOPs ≥ 24 mmHg were randomized to: (1) 500 mcg trabodenoson BID plus latanoprost QD; or (2) timolol BID plus latanoprost QD, for eight weeks. In Part 2 of the study, patients in the study arm were switched to 1,000 mcg trabodenoson QD plus latanoprost QD, and those in the control arm were switched to placebo QD plus latanoprost QD.



*Source: Company presentation.*

68. The study showed a 7.6 mmHg incremental effect with timolol dosed on top of latanoprost, which was statistically superior to the 5.0 mmHg incremental effect that trabodenoson showed on top of latanoprost. Accordingly, the Phase 2 additive study failed to demonstrate what dose of trabodenoson, added to latanoprost, was the predicate for lowering IOP by 5.0 mmHg – or whether trabodenoson has any effect at all on lowering IOP. It was entirely possible that the lowering of IOP seen in the trabodenoson arm of the trial was merely a function of latanoprost

reliability and efficacy is evidenced by its listing on the World Health Organization's List of Essential Medicines.

reaching a certain level in the eye after prolonged dosing. Therefore, the additive Phase 2 trial was technically not a phase 2 trial because it did not establish what dose of trabodenoson was associated with efficacy.

**Phase 3 MATrX-1 Trial:**

69. Nevertheless, likely because of trabodenoson's safety profile, after consultation with the FDA in mid-2015, Inotek was able to get agreement on using a placebo arm as the primary comparator for statistical purposes for Phase 3. The study also was intended to examine three different doses of the drug, again illustrating that the Phase 2 additive study failed to yield data indicating the proper dosage necessary to demonstrate efficacy. The study was named the MATRx-1 study.

70. MATRx-1 was a Phase 3 randomized, double-masked, placebo-controlled trial of trabodenoson in 303 subjects diagnosed with POAG or OHT. MATRx-1 was designed to assess the efficacy, safety and tolerability of trabodenoson over three months of treatment. The primary endpoint was reduction of IOP as compared to the placebo treatment arm. In addition, the study contained a timolol 0.5% arm to validate the sensitivity of the patient population and serve as an internal control.

71. The trial enrolled patients with a diagnosis of POAG or OHT and an IOP greater than or equal to 24 mmHg and less than or equal to 34 mmHg. These patients were randomized to one of five arms – a placebo arm, a timolol arm, and three trabodenoson arms. Three doses of trabodenoson ophthalmic suspension were administered: 3%/1000 mcg QD, 4.5%/1500 mcg BID, and 6%/2000 mcg QD. IOP was measured at four time points during the day (8AM, 10AM, 12PM, and 4PM) on four days during the trial (days 14, 28, 42, and 84).

72. On January 3, 2017, the Company disclosed top-line results for MATRx-1, which

indicated that trabodenoson failed to achieve its primary endpoint of superiority in reduction of IOP compared with placebo at all 12 time points. This was purportedly due, in part, to a placebo response that was 2-3 mmHg greater than that observed in Phase 2.

**Phase 2 FDC Trial:**

73. In July 2016, Inotek initiated a Phase 2 dose-ranging trial of a fixed-dose combination of trabodenoson and latanoprost. This randomized, double-masked Phase 2 trial was reportedly designed to assess the overall benefit/risk profile of different daily doses of trabodenoson when combined with latanoprost in patients with ocular hypertension or POAG.

74. The trial investigated three treatment combinations of trabodenoson and latanoprost, as well as two separate concentrations of latanoprost alone, administered to both eyes for a total of eight weeks. The treatments investigated were: trabodenoson 6%/latanoprost 0.005%; trabodenoson 3%/latanoprost 0.005%; trabodenoson 6%/latanoprost 0.0025%; latanoprost 0.005%; and latanoprost 0.0025%. Each subject was assigned four weeks of morning dosing and four weeks of evening dosing, in a masked manner.

75. The trial was designed to enroll approximately 165 patients with IOPs greater than or equal to 25 mmHg and less than or equal to 34 mmHg, but ultimately enrolled about 200 patients, purportedly due to a lower than anticipated screen failure rate. Active recruitment was completed in April 2017.

76. On July 7, 2017, one minute after the markets closed, Inotek announced top-line results of the FDC trial. According to Mr. Southwell, "the efficacy of the FDC was only marginally differentiated from that of latanoprost alone…. Therefore, the addition of trabodenoson to latanoprost offered no clinically meaningful advantage in eye pressure reduction over latanoprost alone."

**The Materially False and Misleading Statements Issued During the Class Period**

77. The Class Period begins on July 23, 2015, when the Company issued a press release entitled "Inotek Pharmaceuticals Announces Positive End-of-Phase 2 Meeting with FDA and Phase 3 Development Strategy for Trabodenoson, a Novel Treatment for Glaucoma – Pivotal Studies Designed to Show Superiority to Placebo – 1st Phase 3 Study to Commence in 4Q15 with Top-line Data In 2016." The press release stated that the Company was "in final preparation stages to commence its first Phase 3 trial to support a New Drug Application (NDA) for trabodenoson" and touted the Company's achievements to date during its Phase 2 trials. It was otherwise false and misleading, and omitted material information. Each particular false and misleading statement or omission of material information described herein – as well as the reasons why such statements were false, misleading, or omitted material information – is summarized in the Addendum attached to this complaint and incorporated herein by reference.

78. For example, the press release quoted Dr. Baumgartner as follows:

> 'There is a major unmet medical need for a well-tolerated and effective therapy with a new mechanism of action for glaucoma,' said Rudolf Baumgartner, M.D, Chief Medical Officer of Inotek. 'Our overall program will consist of three clinical trials encompassing a total subject exposure of 1300 patients. Our previous Phase 2 studies have demonstrated that trabodenoson's efficacy improves over time, and with increases in dose. A benefit of the Phase 3 superiority design is that we can investigate more than one dose of trabodenoson, allowing us to further optimize the drug's clinical and safety profile.'

79. Dr. Baumgartner's statement that "[o]ur previous Phase 2 studies have demonstrated that trabodenoson's efficacy improves over time, and with increases in dose" was materially misleading and omitted important information concerning what actually occurred and was learned during the Phase 2 trials.

80. First, Dr. Baumgartner did not distinguish between the Company's additive Phase 2 trial (where trabodenoson was dosed with latanoprost) and the Phase 2 trabodenoson

monotherapy study. This was a material omission because while the Phase 2 monotherapy study did demonstrate that the drug was reactive versus placebo, the additive study did not yield data indicating that trabodenoson was the cause of the IOP reduction observed in patients. Nor did it show conclusive data that prescribing trabodenoson as a monotherapy for glaucoma would lower IOP – at least not without the added power of a widely-used and accepted prostaglandin such as latanoprost, which had already proven to be effective in treating glaucoma. Accordingly, it was materially misleading for Dr. Baumgartner to state "[o]ur previous Phase 2 studies have demonstrated that trabodenoson's efficacy improves over time, and with increases in dose" when the additive study did not indicate whether trabodenoson in fact was the cause of lower IOP when dosed with latanoprost.

81. Second, Dr. Baumgartner's statement was also false and misleading because the additive study failed to determine what dose of trabodenoson would demonstrate efficacy. Trabodenoson's effective dose was yet to be established because it had only been dosed with latanoprost. Accordingly, Defendants did not know whether the decrease in IOP observed in the additive study was the result of administration of trabodenoson alone, latanoprost alone, or the combination of the administration of the two drugs – latanoprost, an approved and effective drug, and trabodenoson.

82. Third, Dr. Baumgartner's statement that Inotek's Phase 2 trials "demonstrated that trabodenoson's efficacy improves over time and with increases in dose" was false and misleading in that he failed to disclose the type of dosing used in the Phase 2 trials. Inotek intended to seek approval for trabodenoson monotherapy in a "convenient" QD dose. In both the monotherapy Phase 2 study and part 1 of the additive Phase 2 study, however, trabodenoson was dosed BID. In part 2 of the additive Phase 2 study, trabodenoson was dosed QD, but ***only*** in combination with a QD dose of latanoprost. Thus, until the Phase 3 trial, there had been ***no*** data from which Inotek

had been able to observe the IOP-lowering effects of a QD dose of trabodenoson alone.

83. Fourth, whatever information Inotek may have had about the efficacy of trabodenoson as a monotherapy going into Phase 3 was limited to information about the efficacy of the drug when dosed BID. Inotek had absolutely no information, therefore, from which it could reasonably predict that the two QD trabodenoson arms in the Phase 3 trial would demonstrate ***any*** efficacy. Nevertheless, Defendants failed to disclose this material information to the market.

84. Finally, Dr. Baumgartner further failed to explicate that the additive study included an arm that tested patients dosed with timolol and latanoprost and that the patients who received that combination saw significantly higher reductions in IOP than those who were dosed with the combination of trabodenoson and latanoprost. Accordingly, Dr. Baumgartner failed to disclose the material information that the additive Phase 2 trial, which administered trabodenoson and latanoprost as compared to the administration of latanoprost and timolol, was not a true Phase 2 study in that it failed to determine a dose of trabodenoson that would lower IOP if used as a monotherapy. He also failed to disclose material information regarding the latanoprost and timolol comparator arm of the study, which lowered IOP substantially more than the combination of latanoprost and trabodenoson.

85. The July 23, 2015 press release further detailed how trabodenoson's Phase 3 trial would be designed, including that the drug would be compared to a placebo – a highly unusual and seemingly easy hurdle to overcome to demonstrate efficacy. The press release stated as follows:

> The trial design for the first pivotal study is a five-arm superiority trial that will include three doses of trabodenoson. These doses were selected to optimize lowering of intraocular pressure while maintaining the good tolerability observed in Phase 2 trials. The primary efficacy endpoint of the study is the reduction of intraocular pressure (IOP), statistically superior as compared to placebo. A

comparator arm of timolol will also be included for study validation, but not for statistical comparison.

86. The foregoing statement was misleading. While the Phase 2 trials may have shown "good tolerability" in light of limited adverse events during the trials, the additive trial had not demonstrated that trabodenoson lowered IOP standing alone at any specific dosage. Furthermore, the press release conflated the two Phase 2 studies, failing to mention the additive trial. As such, this statement omits whether the additive trial or the earlier Phase 2 trial had yielded the data supporting that basis for progressing to Phase 3.

87. Moreover, the Company stated that the Phase 3 trial would have a "comparator arm of timolol . . . for study validation, but not for statistical comparison," touting that trabodenoson only had to perform better than a placebo. This statement was misleading and omitted to fully explicate why the timolol arm was included.

88. Given that both Phase 2 trials failed to determine a dose associated with efficacy and that trabodenoson lowered IOP on its own without the assistance of latanoprost, a timolol arm was necessary to judge whether trabodenoson lowered IOP relative to established, safe, and mature glaucoma medications such as timolol. Accordingly, it was misleading to tout a placebo-based trial absent detailing why it was necessary to run a comparator arm with an established drug like timolol.

89. Also on July 23, 2015, the Company held a conference call with securities analysts to discuss "Phase 3 Development," during which Dr. Baumgartner and Mr. Southwell answered a question posed by an analyst from Piper Jaffray. The analyst queried:

> *Steven Breazzano - Piper Jaffray*: I have two quick questions. Will there be a non-inferiority measured timolol? And second, just hypothetically, if the placebo were to do very well, versus the active, and non-inferiority timolol was shown, what will happen in that case? Thanks.

> *Rudolf Baumgartner*: So just so I understand the question, you asked first, are we going to do a non-inferiority timolol on this trial, and the answer is no. We're not powered for that. That will require a much larger sample size than we're studying.
>
> The second question, I think you asked is, what would happen if placebo did really well, is that correct?
>
> *Steven Breazzano - Piper Jaffray*: Yes. And it did look relatively non-inferior to timolol.
>
> *Rudolf Baumgartner*: So you're talking about the internal validation of the assay which is a great question. In general, if there is no separation between the placebo or any of the actives, then you worry about the trial integrity which is why timolol is there.
>
> If for example, placebo did really well, it was no different than timolol, but Trabo was different than timolol, or placebo, that's a valid study. So the internal control basically validates when the signal is collapsed, if that makes sense. So even if timolol did not work, but we work, and we were better than either placebo or timolol, it's still a valid study.
>
> *David Southwell*: So while we're not comparing – we're not doing a formal non-inferiority study, we are comparing our drug to timolol because we have a timolol arm in the study. So clinically, we're absolutely comparing to timolol. And I would just point out on the statistics, that in our Phase 2 study, we showed very good statistical significance of lower doses to placebo.

90. The foregoing was misleading. While Mr. Southwell stated that the timolol arm was important as a "comparator" and states that "Trabo" had done well against placebo in Phase 2, he omits that "Trabo" along with latanoprost was statistically inferior to timolol and latanoprost in the additive study. Accordingly, he failed to disclose the significant possibility that "Trabo" did not demonstrate efficacy relative to timolol (and may not have been active at all) and the FDA demanded a timolol arm to determine whether trabodenoson was at all responsible for any lowering of IOP in the additive Phase 2 trial. Moreover, Mr. Southwell failed to state that while trabodenoson "showed very good statistical significance of lower doses to placebo" it had not proven effective in lowering IOP absent being dosed with latanoprost in the additive Phase 2 trial.

91. On August 6, 2015, Inotek issued a press release reporting second quarter 2015

financial results and operational highlights. Touting the upcoming Phase 3 trial, Mr. Southwell stated:

> 'Importantly, our End-of-Phase 2 meeting with the FDA was a critical milestone for advancing the development of trabodenoson. Based on this meeting with the FDA, we reported the design for our first Phase 3 clinical trial of trabodenoson that provides a more efficient path to define the drug's clinical and safety profile through a superiority trial statistically compared to placebo. We are excited to begin recruiting patients for this trial in the fourth quarter of this year.'

92. Describing Phase 3 as "a superiority trial statistically compared to placebo," though literally accurate, was misleading because it omitted that the study would nevertheless include a timolol arm as a comparator, thus creating the false and misleading impression that timolol would have no bearing on the results of the study or trabodenoson's prospects for approval. Moreover, Mr. Southwell failed to disclose the material fact that the Company was still unable to state what dosage of trabodenoson was associated with efficacy either as a monotherapy or as dosed with latanoprost.

93. On October 16, 2015, the Company issued a press release entitled "Inotek Pharmaceuticals Initiates Dosing of MATRx-1, the First Pivotal Phase 3 Clinical Trial of Trabodenoson, a Novel Treatment for Glaucoma." The release quoted Dr. Baumgartner as follows:

> 'Based on the encouraging Phase 2 results as well as guidance from the U.S. Food and Drug Administration (FDA), our team has formalized plans for our Phase 3 program to support a New Drug Application (NDA) for trabodenoson in glaucoma,' commented Rudolf Baumgartner, MD, Chief Medical Officer of Inotek. 'If approved, trabodenoson—with its potential for once daily dosing and a mechanism that may compliment currently available glaucoma medications—has potential as a valuable treatment option for physicians managing the IOP of patients with this disease.'

94. Here, Dr. Baumgartner explicitly mentioned trabodenoson's "potential for once daily dosing." This statement was misleading because, at the time Dr. Baumgartner made this statement, he had absolutely no information to support the hypothesis that trabodenoson could be

effective when dosed only once a day and used as a monotherapy. As explained above, neither of the Phase 2 trials included doses of trabodenoson that were administered QD without being dosed alongside latanoprost, an accepted and effective drug, and thus Dr. Baumgartner had no data regarding the efficacy of trabodenoson when given to patients as a monotherapy only once per day.

95. In fact, at the time dosing was initiated in MATRx-1, only ***six*** subjects had received QD dosing of trabodenoson alone. All six of these subjects were part of Phase 1 and, as such, had not been diagnosed with any form of glaucoma. As such, at the time Phase 3 began, Inotek could not have made any observations as to the potential IOP-lowering ability of trabodenoson when administered QD in glaucoma patients without an additive prostaglandin analog ("PGA") like latanoprost.

96. Moreover, as detailed above, the additive Phase 2 trial did not yield data properly characterized as "encouraging." First, the additive Phase 2 trial did not provide any clinical evidence indicating that trabodenoson demonstrated efficacy when prescribed as a monotherapy rather than an additive to latanoprost. Second, the efficacy demonstrated by the combination of trabodenoson and latanoprost was statistically significantly lower than the efficacy of latanoprost dosed with timolol.

97. On November 12, 2015, Inotek issued a press release announcing third quarter 2015 financial results and operational highlights. Mr. Southwell stated that Inotek's third quarter was marked by "meaningful regulatory, clinical and financial accomplishments." This statement was misleading because it failed to disclose that Inotek's Phase 2 additive study results were hardly a "meaningful . . . clinical accomplishment" insofar as they did not study the effects of trabodenoson as a monotherapy and thus provided no "meaningful" data on the efficacy of the drug.

98. On March 23, 2016, Inotek filed its Form 10-K for the fiscal year ended December 31, 2015, which assured investors that trabodenoson was bound for success, stating "[o]ur clinical trials have shown that *trabodenoson* has significant IOP-lowering effects, convenient dosing and also has a favorable safety profile when compared to the currently available glaucoma treatments, such as PGAs and non-PGAs." (Emphasis in original). The 10-K stated that trabodenoson monotherapy had "IOP-lowering effects in line with existing therapies" and that it had "the potential to be used as a monotherapy in place of current glaucoma treatments."

99. These statements were false and misleading for several reasons. First, at the time the 10-K was filed with the SEC, the Company's clinical trials had not shown that trabodenoson had convenient dosing when compared to currently available glaucoma treatments. With the exception of PGAs, all glaucoma drugs need to be administered (as eye drops) two or three times per day. As such, there is a need in the market for a simpler dosing regimen. Inotek *intended* to develop and market trabodenoson as a once-daily eye drop, which would have provided a certain amount of convenience lacking in the market. Nevertheless, the Phase 2 trials did not demonstrate anything about trabodenoson's ability to be effectively dosed as a monotherapy only once a day. Some of the subjects in the Phase 2 additive study received QD doses of trabodenoson, but those doses were administered along with latanoprost, making it impossible to determine how much (if any) of the decrease in IOP resulted from that dose of trabodenoson. All subjects in the Phase 2 monotherapy study received trabodenoson twice a day.

100. Second, neither of the Phase 2 trials suggested that trabodenoson had "IOP-lowering effects in line with existing therapies." While Inotek focused on the results of its Phase 2 monotherapy trial, its additive Phase 2 trial purportedly demonstrated that timolol was statistically superior to trabodenoson. Thus, at the time the 10-K was filed, the IOP-lowering

effects of trabodenoson were far from clear.

101. Continuing to downplay the additive study, a July 2016 corporate presentation made by Mr. Southwell at the Cantor Fitzgerald Annual Health Care Conference misleadingly suggested that the Company's Phase 3 trial was "optimized for success." Seemingly discussing only the Phase 2 monotherapy trial, the presentation stated that it showed "clear dose response, good ocular and systemic safety, ability to dose QD or BID, additive efficacy to prostaglandins." This Phase 2 trial, however, did not even test the effectiveness of dosing trabodenoson QD.

102. On July 12, 2016, Inotek announced that it had initiated a "Phase 2 dose-ranging trial of a fixed-dose combination (FDC) of *trabodenoson* and *latanoprost*," touting trabodenoson's ability to reduce IOP, as reportedly observed in the Company's Phase 2 clinical trials. (Emphasis in original). With regard to the FDC trial, Dr. Baumgartner stated: "We believe that a fixed-dose combination of *trabodenoson* with *latanoprost* has the potential to provide patients and physicians with a novel treatment option that offers the convenience of a single daily drop, with two complementary eye pressure lowering mechanisms, and an optimized safety and efficacy profile." (Emphasis in original).

103. Dr. Baumgartner's statement was false and misleading because he had no basis to believe that the eye pressure lowering mechanisms of trabodenoson and latanoprost were complementary. In fact, the Phase 2 additive study – the only portion of Inotek's clinical trials to study the way in which trabodenoson and latanoprost performed together – demonstrated that the IOP-lowering effects of trabodenoson and latanoprost together were statistically inferior to the effects of timolol and latanoprost dosed together. Moreover, that study failed to yield data indicating that trabodenoson was at all responsible for lowering IOP when combined with latanoprost.

104. Similarly, Dr. Baumgartner omitted material information regarding the potential efficacy of the FDC. The statement that "a fixed-dose combination of *trabodenoson* with *latanoprost* has the potential to provide…an optimized…efficacy profile" is misleading because it omits to disclose that co-administration of timolol and latanoprost demonstrated significantly more efficacy than the administration of trabodenoson and latanoprost together. Though the FDC of trabodenoson and latanoprost would undoubtedly be more ***convenient*** than co-administration of timolol and latanoprost, Dr. Baumgartner had no basis to believe that the FDC would demonstrate an "optimized…efficacy profile" as compared to other treatment options.

105. On August 1, 2016, Inotek issued a Prospectus and accompanying Prospectus Supplement (the "Prospectus") in connection with a proposed public offering of $50 million of Convertible Senior Notes due 2021. The Prospectus stated the following about Inotek's clinical trials of trabodenoson:

> Our product pipeline includes trabodenoson monotherapy delivered in an eye drop formulation, as well as a fixed-dose combination, or FDC, of trabodenoson with latanoprost given once-daily, or QD. We are also evaluating the potential of trabodenoson to slow the loss of vision associated with glaucoma and degenerative retinal diseases. Statistically significant results for the primary endpoint of our completed Phase 2 clinical trial indicate that trabodenoson monotherapy has IOP-lowering effects in line with existing therapies, with a favorable safety and tolerability profile at all doses tested. Our completed Phase 2 trial of trabodenoson co-administered with latanoprost, a prostaglandin analogue, or PGA, demonstrated IOP-lowering in patients who have previously had inadequate responses to treatment with latanoprost. These patients represent PGA poor-responders, as evidenced by persistently elevated IOP at levels that typically require the addition of a second drug to further lower IOP.

These statements were materially false and misleading because, as set forth above, the Phase 2 trial: (a) did not result in clear data regarding once-daily dosing; and (b) did not result in clear data about the efficacy of trabodenoson insofar as the additive Phase 2 study demonstrated that timolol was statistically superior to trabodenoson.

106. In a November 2016 corporate presentation, the Company continued to tout the

purported ability to dose QD or BID. In discussing Phase 2, however, the presentation only presented data from the Phase 2 monotherapy trial, in which all doses of trabodenoson were administered BID. This data was misleading both as to the convenience of dosing and the results of the Phase 2 trials. The IOP lowering seen in the Phase 2 monotherapy trial cannot be attributed to Phase 2 in general, as the additive Phase 2 study did not evaluate the correct dose of trabodenoson as a monotherapy or provide a basis for the administration of doses in Phase 3. Without also presenting the results of the additive Phase 2 study, which demonstrated that timolol was statistically superior to trabodenoson, any results of the Phase 2 monotherapy were entirely misleading. As Defendants had done throughout the Class Period, this presentation also failed to provide material information about the use of timolol as a comparator in Phase 3.

**The Truth Concerning Trabodenoson's Ineffectiveness and Defendants' False Statements Begins to Emerge**

107. On January 3, 2017, before the market opened, Inotek issued a press release announcing that the first pivotal Phase 3 trial of trabodenoson for the treatment of POAG or OHT failed to achieve its primary endpoint of superiority in the reduction of IOP compared with placebo at all 12 time points.

108. According to the press release, "[t]he trial did not achieve its primary endpoint of superiority in reduction of intraocular pressure (IOP) compared with placebo at all 12 time points. This was, in part, due to a placebo response that was 2-3 mmHg greater than that observed in Phase 2." In particular, "[t]he primary endpoint of the MATrX-1 trial was the IOP reduction of trabodenoson compared to that of placebo on Days 28, 42 and 84 and a four time points during each of these days: 8AM, 10AM, 12PM, and 4PM. The 8AM time point did not achieve statistical separation with any trabodenoson dose. This was primarily due to an unexpectedly high placebo response compared to that observed in Phase 2..."

109. The market reaction to these disastrous results was swift and severe, with analysts noting that even the one dose of trabodenoson that came close to success still met a negative fate, casting significant doubt over the efficacy of the drug.

110. On this news, the price of Inotek common stock declined from a closing price of $6.10 per share on December 30, 2016 to a closing price of only $1.75 per share on January 3, 2017, a drop of approximately 70%, on extremely heavy trading volume.

111. Defendants, however, had not disclosed the entirety of their malfeasance, and continued to conceal the disappointing truth about trabodenoson's efficacy even after announcing the results of the MATRx-1 trial.

**Defendants Continue to Mislead their Investors After the MATRx-1 Failure**

112. On March 16, 2017, Inotek filed its annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K"). Despite the results of the additive Phase 2 study, which clearly demonstrated that co-administration of timolol and latanoprost lowered IOP significantly more than co-administration of trabodenoson and latanoprost, the 2016 10-K repeatedly stated that the additive study had demonstrated "IOP-lowering in patients who have previously had inadequate responses to *latanoprost*" without disclosing that this reduction in IOP was statistically inferior to the reduction in IOP observed after co-administration of timolol and latanoprost in the same patient population.

113. Also on March 16, 2017, Defendants issued a press release reporting the Company's financial results and operational highlights for the 2016 fiscal year. The press release was materially false and misleading with respect to its discussion of both the MATRx-1 trial and the FDC study.

114. For example, the press release quoted Defendant Southwell as follows:

> ‘In 2016, Inotek completed the Phase 3 MATrX-1 clinical trial of *trabodenoson* for the treatment of primary open-angle glaucoma and/or ocular hypertension and also initiated a Phase 2 trial to identify a potential fixed-dose combination of *trabodenoson* and *latanoprost* for the same indications,’ said David P. Southwell, President and Chief Executive Officer of Inotek. ‘While MATrX-1 did not achieve its primary endpoint, superiority in reduction of mean intraocular pressure (IOP) compared to placebo, we believe this result was driven by placebo outliers at a few trial sites.’ (Emphasis in original).

115. Mr. Southwell’s statement that Inotek had “initiated a Phase 2 trial to identify a potential fixed-dose combination” of trabodenoson and latanoprost for the treatment of POAG and/or OHT omitted material information that would have altered the total mix of information available to investors.

116. First, this statement omitted that the Company’s Phase 2 additive study, which had observed the effects of the same two drugs when co-administered, did not yield data indicating that trabodenoson was the cause of the IOP reduction observed in patients. Given the largely inconclusive results of the additive study – coupled with the failure of the MATRx-1 trial – it was false and misleading for Mr. Southwell to mention the Phase 2 FDC trial without disclosing to investors that at least two of the Company’s previous trabodenoson trials cast doubt on the potential efficacy of Inotek’s FDC product candidate.

117. Second, Mr. Southwell failed to disclose that the IOP reduction observed in patients who were dosed with trabodenoson and latanoprost during the additive study was statistically inferior to the reduction in IOP observed in patients dosed with timolol and latanoprost. The additive study had also failed to demonstrate what dose of trabodenoson, co-administered with latanoprost, was necessary to lower IOP – or whether trabodenoson had any effect at all on lowering IOP.

118. Moreover, Mr. Southwell’s statement regarding the failure of MATRx-1 to achieve its primary endpoint was false and misleading because it attributed the discouraging results to

"outliers at a few trial sites." The Phase 3 MATRx-1 trial had, in fact, demonstrated not only that trabodenoson was not superior to placebo at reducing mean IOP but that trabodenoson did not demonstrate superior reduction of IOP compared with placebo ***at all 12 time points*** studied during the trial. Indeed, at the 8AM time point, statistical separation was not achieved with ***any*** dose of trabodenoson.

119. Mr. Southwell also stated that "the Phase 2 fixed-dose combination study of *trabodenoson* with *latanoprost*, addressing a considerably larger market opportunity than monotherapy," was "fully enrolled," and that the Company expected "to report top-line data in mid-2017." (Emphasis in original). This statement was false and misleading because, at the time Mr. Southwell spoke about the potential market opportunity of the FDC, Inotek had no data indicating that the fixed-dose combination would demonstrate efficacy – let alone satisfy a considerable need in the market.

120. Defendants continued to express unfounded optimism when they announced the completion of patient recruitment for the FDC trial in an April 11, 2017 press release. Mr. Southwell described the completion of active recruitment as "an important milestone as we continue to believe our FDC program has the potential to address a larger market opportunity than monotherapy and provide patients with a novel treatment option that includes two complementary eye pressure lowering mechanisms."

121. As stated above, Defendants' additive Phase 2 trial failed to yield data indicating whether trabodenoson demonstrated efficacy because it was dosed with latanoprost. Defendants conflated the inconclusive Phase 2 additive trial with the results of the Phase 2 monotherapy trial. Accordingly, stockholders were led to believe that trabodenoson was effective, even though there was scant evidence in support of the proposition.

122. The press release also described trabodenoson as "a highly selective adenosine mimetic that lowers intraocular pressure (IOP) by augmenting the natural function of the trabecular meshwork, the primary outflow pathway in the eye." While it may have been the ***goal*** of the Company to develop "a highly selective adenosine mimetic that lowers intraocular pressure (IOP) by augmenting the natural function of the trabecular meshwork," at the time Inotek issued this press release, the Company was well aware that trabodenoson was not even more effective than ***placebo*** at lowering IOP. Therefore, to describe trabodenoson in such unequivocal terms was entirely false and misleading.

123. Disturbingly, the FDC trial began in July 2016, well after the additive study ended in ***2015***. Moreover, the unsuccessful MATRx-1 study failed in January 2017. Therefore, Defendants have known since 2015 – though they conducted two subsequent studies – that statements concerning trabodenoson's efficacy were false, misleading, and omitted material information.

124. On May 10, 2017, the Company issued a press release reporting financial results and operational highlights for the first quarter of the 2017 fiscal year. In addition to disclosing Inotek's intention to "look[] into *trabodenoson's* utility beyond the lowering of eye pressure," Mr. Southwell was quoted as follows:

> 'Our Phase 2 fixed-dose combination (FDC) trial of *trabodenoson* and *latanoprost* is ongoing, and we recently completed the active recruitment phase,' said David P. Southwell, President and Chief Executive Officer. 'We look forward to top-line results from this trial in July, and providing an update on our strategy for the development path for *trabodenoson* in glaucoma. We have communicated with the US Food and Drug Administration (FDA) regarding the MATrX-1 results. The FDA is in agreement with our conclusions that the trial did not meet its primary efficacy endpoint, however the safety profile of *trabodenoson* was comparable to placebo and there was minimal drug-related hyperemia.' (Emphasis in original).

125. As with his earlier statements touting the ability of the FDC trial to save the

Company, Mr. Southwell's statements about the Company's communication with the FDA were false and misleading. The disclosure that the FDA agreed with Inotek's conclusion that the MATRx-1 trial did not meet its primary efficacy endpoint omitted to provide investors with ***any*** material information about whether, in the FDA's opinion, trabodenoson had any future clinical potential – as a monotherapy or otherwise.

**Defendants Can No Longer Hide the Truth About Trabodenoson**

126. On July 7, 2017, the Company released top-line results of the Phase 2 fixed-dose combination trial of trabodenoson. This study, called the "FDC trial," observed a fixed-dose combination of trabodenoson and latanoprost. According to the press release, the efficacy of the FDC was only marginally differentiated from that of latanoprost alone. In short, according to the Company, the FDC of trabodenoson and latanoprost offered no "clinically meaningful advantage in eye pressure reduction over latanoprost alone."

127. These results again demonstrate that the Defendants' statements concerning the Phase 2 additive study were misleading. Specifically, as discussed herein, the Phase 2 additive study failed to demonstrate whether trabodenoson had any clinical effect absent being dosed with latanoprost. The FDC results now confirm this.

128. After the close of the markets on Friday, July 7, 2017, when Defendants announced that the FDC trial had unequivocally failed, the share price of Inotek dropped from $1.73 at close of trading on July 7, 2017 to $0.90 as of 12:00 PM on Monday, July 10, a decrease of ***nearly 48%***. During a subsequent conference call on July 10, 2017, during which no analyst asked a single question, Defendant Southwell stated that the Company had hired an investment bank to consider strategic options for the Company and trabodenoson.

129. Less than a month after the close of the Class Period, on August 3, 2017, Defendants

issued a press release stating that "[b]ased on the efficacy results shown to date for the FDC and monotherapy programs, we have decided to discontinue all preclinical and clinical development activities associated with *trabodenoson* in order to preserve our case for value-creating opportunities." (Emphasis in original).

## ADDITIONAL SCIENTER ALLEGATIONS

130. There can be no reasonable dispute either that Defendants knew the complete results of the Phase 2 monotherapy trials throughout the Class Period or that Defendants knew the complete results of the Phase 3 MATRx-1 trial months before the end of the Class Period. Therefore, the fact that Defendants published statements that were inaccurate or misleadingly incomplete is evidence of scienter.

131. The Company's stock price and ability to raise capital relied almost exclusively on positive trabodenoson clinical trial results, which would allow Inotek to add trabodenoson to the list of other approved monotherapies prescribed to treat glaucoma.

132. The success of trabodenoson was critical to Inotek's success, particularly as the drug – dosed either as a monotherapy or a fixed-dose combination – was the only product under development by the Company.

133. Particularly after the failure of Inotek's MATRx-1 trial, it was crucial for the Company's very survival that its FDC trial succeed, as the fixed-dose combination of trabodenoson and latanoprost was the only product candidate remaining in the Company's near-term product pipeline.

134. The notion that the Individual Defendants, who frequently commented on trabodenoson and who were running a company devoted entirely to trabodenoson, did not appreciate the import of the actual clinical trial results is absurd. The Individual Defendants must

have monitored the trial results, and made detailed statements throughout the Class Period demonstrating their actual knowledge of that data.

135. The highly unreasonable omissions and misstatements alleged herein presented a danger of misleading investors that was known to the Defendants or so obvious that they must have been aware of it.

136. In fact, the statements made by Defendants throughout the Class Period were aimed primarily at investors, who would be inclined to rely on them rather than digging into the dense and technical results (to the extent they were publicly-available) of the Phase 2 studies themselves. Knowing that investors would be unlikely to delve into the results of these studies, Defendants distorted the results of the Phase 2 monotherapy studies and regularly omitted that there were two Phase 2 monotherapy studies rather than just one.

137. Defendants were reckless in omitting information about the Phase 2 monotherapy studies that would have allowed investors to make an informed comparison. Moreover, Defendants did not qualify any of their statements about the performance of trabodenoson during Phase 2, though the additive Phase 2 study was not consistent with the results observed in the Phase 2 monotherapy study.

138. In addition, Defendants were well aware that several other companies were concurrently developing ophthalmological products targeting the trabecular meshwork pathway. As this unique mechanism of action was also being developed by other companies, getting FDA approval quickly was of paramount importance. The first company to get FDA approval of this mechanism of action would have an exclusive to market for six months. Thus, any delays in the development of trabodenoson would delay Inotek's ability to market trabodenoson and push a potential trabodenoson commercial launch into an even more crowded glaucoma market.

139. In particular, prior to and during the Class Period, Aerie Pharmaceuticals, Inc. ("Aerie") was also developing a glaucoma medication that targeted the trabecular meshwork. During the Class Period, Aerie had successfully completed two Phase 3 registration studies of Rhopressa, a once-daily Rho kinase inhibitor that targeted the trabecular meshwork.

140. While the approach of targeting the trabecular meshwork had been relatively novel, Defendants were well aware that continued progress of Rhopressa through the FDA approval process would hold up approval to market trabodenoson, making trabodenoson less appealing to the market.

**NO SAFE HARBOR**

141. The statutory safe harbor provided for certain forward-looking statements does not apply to any of the false statements alleged herein. None of the statements alleged herein are "forward-looking" statements and no such statement was identified as a "forward-looking statement" when made. Rather, the statements alleged herein to be false and misleading all relate to facts and conditions existing at the time the statements were made. Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any forward-looking statements.

142. In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein which is deemed to be forward-looking, the Defendants are liable for such false forward-looking statements because at the time each such statement was made: (1) the speaker actually knew and/or recklessly disregarded the fact that such forward-looking statements were materially false or misleading and/or omitted facts necessary to make statements previously made not materially false and misleading; and/or (2) that each such statement was authorized and/or approved by a director and/or executive officer of Inotek who actually knew or recklessly

disregarded the fact that each such statement was false and/or misleading when made. None of the historic or present tense statements made by the Defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## LOSS CAUSATION/ECONOMIC LOSS

143. During the Class Period, the Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Inotek's stock price and operated as a fraud or deceit on purchasers of Inotek common stock by misrepresenting the results of Phase 2 trials of trabodenoson, as well as projecting the potential for success of the Phase 3 trabodenoson trial. Once the Defendants' misrepresentations and fraudulent conduct were disclosed to the market, Inotek's stock price decreased precipitously. As a result of their purchases of Inotek stock during the Class Period, Plaintiff and other members of the Class suffered economic loss.

144. The Defendants' false and misleading statements had the intended effect and caused Inotek stock to trade at artificially inflated levels throughout the Class Period.

145. As investors in the market became aware of Inotek's prior misstatements and omissions, Inotek's stock price reacted negatively, damaging investors.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

146. At all relevant times, the market for Inotek's common stock was an efficient market for the following reasons, among others:

(a) Inotek's stock met the requirements for listing, and was listed and actively traded on the NasdaqGM, a highly efficient market;

(b) During the Class Period, Inotek stock was actively traded, demonstrating a very strong presumption of an efficient market;

(c) As a regulated issuer, Inotek filed with the SEC periodic public reports during the Class Period;

(d) Inotek regularly communicated with public investors via established market communication mechanisms;

(e) Inotek was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(f) Unexpected material news about Inotek was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

147. As a result of the foregoing, the market for Inotek's common stock promptly digested current information regarding the Company from all publicly-available sources and reflected such information in Inotek's stock price. Under these circumstances, all purchasers of Inotek's common stock during the Class Period suffered similar injury through their purchases of Inotek's common stock at artificially inflated prices, and a presumption of reliance applies.

**CLASS ACTION ALLEGATIONS**

148. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Inotek securities during the Class Period (the "Class"). Excluded from the Class are Defendants and their families,

the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

149. The members of the Class are so numerous that joinder of all members is impracticable, since Inotek has millions of shares of stock outstanding and because the Company's shares were actively traded on the NASDAQ. As of September 30, 2016, Inotek had more than 26.9 million shares issued and outstanding. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed.

150. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members, include:

(a) whether the Defendants violated the Exchange Act;

(b) whether the Defendants omitted and/or misrepresented material facts in their publicly-disseminated reports, press releases, and statements during the Class Period;

(c) whether the price of Inotek securities was artificially inflated during the Class Period as a result of the material omissions and/or misrepresentations complained of herein; and

(d) whether the members of the Class have sustained damages as a result of the decline in value of Inotek's stock when the truth was revealed.

151. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class

sustained damages from the Defendants' wrongful conduct in a substantially identical manner.

152. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the other members of the Class.

153. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

154. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

155. This Count, asserted against all of the Defendants, is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

156. During the Class Period, the Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and/or misleading statements specified above, which they knew or deliberately disregarded were false and/or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

157. The Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) Employed devices, schemes and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Inotek securities during the Class Period.

158. The Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Inotek were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants, by virtue of their receipt of information reflecting the true facts regarding Inotek, their control over and/or receipt of and/or modification of Inotek's allegedly materially false and misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Inotek, participated in the fraudulent scheme alleged herein.

159. The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Inotek personnel to members of the investing public, including Plaintiff and the Class.

160. As a result of the foregoing, the market price of Inotek securities was artificially inflated during the Class Period. In ignorance of the falsity of the Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Inotek securities during the Class Period in purchasing Inotek securities at prices that were artificially inflated as a result of the Defendants' false and misleading statements.

161. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

162. By reason of the foregoing, the Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the other members of the Class for the substantial damages they suffered in connection with their purchase of Inotek securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

163. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

164. During the Class Period, the Individual Defendants participated in the operation and management of Inotek, and conducted and participated, directly and indirectly, in the conduct of Inotek's business affairs. Because of their senior positions, the Individual Defendants knew or recklessly disregarded the fact that the adverse information specified herein had not been disclosed to, and was being concealed from, the investing public. Plaintiff and the other members of the Class had no access to such information, which was and is solely under the control of the Defendants.

165. As officers and/or directors of a publicly-owned company, the Individual Defendants had a duty to disseminate accurate and truthful information about the Company to the investing public, and to correct promptly any public statements issued by Inotek that had become materially false or misleading.

166. Because of their positions of control and authority as senior officers and/or directors of the Company, the Individual Defendants were able to, and did, control the contents of the

various reports, press releases and public filings that Inotek disseminated in the marketplace during the Class Period concerning Inotek's trabodenoson trial. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Inotek to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Inotek within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Inotek securities.

167. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Inotek.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

(A) Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and designating Plaintiff as class representative and Plaintiff's counsel as Class Counsel;

(B) Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all of the Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(C) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees and expert fees; and

(D) Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: September 5, 2017

Respectfully submitted,

**LEVI & KORSINSKY LLP**

/s/ *Shannon L. Hopkins*
Shannon L. Hopkins (BBO #657485)
shopkins@zlk.com
Stephanie A. Bartone (BBO #684270)
sbartone@zlk.com
733 Summer Street, Suite 304
Stamford, Connecticut 06901
Tel: (203) 992-4523
Fax: (212) 363-7171

*Liaison Counsel for Lead Plaintiff and the Class*

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Gregory M. Nespole (*pro hac vice*)
GMN@whafh.com
Regina M. Calcaterra (*pro hac vice*)
calcaterra@whafh.com
Correy A. Kamin (*pro hac vice*)
kamin@whafh.com
270 Madison Avenue
New York, New York 10016
Tel: (212) 545-4600
Fax: (212) 686-0114

**BRONSTEIN GEWIRTZ & GROSSSMAN, LLC**
Peretz Bronstein
Yitzchak Eliezer Soloveichik
60 East 42nd Street, Suite 4600
New York, New York 10165
Tel: (212) 697-6484
Fax: (212) 697-7296

*Co-Lead Counsel for Lead Plaintiff and the Class*

**CERTIFICATE OF SERVICE**

I, Shannon L. Hopkins, hereby certify that a copy of the foregoing Second Amended Complaint for Violations of Federal Securities Laws, filed through CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on September 5, 2017.

*/s/ Shannon L. Hopkins*

/794436